# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**JULIA A. MAGGIO,**                                          Chapter 7
     Debtor                                          Case No. 13-16257-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**PATRICIA TAATJES** and
**MAUREEN EMERY**,
     Plaintiffs
v.                                                              Adv. P. No. 14-1025
**JULIA A. MAGGIO**,
     Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~


## MEMORANDUM


## I. INTRODUCTION

The matters before the Court are Cross-Motions for Summary Judgment filed by the

Plaintiffs, Patricia Taatjes ("Taatjes") and Maureen Emery ("Emery")(collectively, the

"Plaintiffs"), and the Defendant, Julia A. Maggio ("Maggio" or the "Debtor").  The Court

heard the Cross-Motions on August 19, 2014 and took them under advisement.  The issues

presented are whether this Court should apply collateral estoppel to preclude the Debtor

from challenging a state court judgment obtained by the Plaintiffs, and whether the Debtor

is entitled to summary judgment based upon the affidavit of an attorney who was not called to testify in the state court proceeding and whose testimony would contradict factual findings of the state court, as well as medical records submitted by the Plaintiffs.

## II. PROCEDURAL BACKGROUND

The Debtor filed a voluntary Chapter 7 petition on October 25, 2013.  On Schedule F-Creditors Holding Unsecured Nonpriority Claims, the Debtor listed Taatjes and Emery as the holders of claims in the sum of $125,000 arising out of a "2013 Court Judgment - Now on Appeal Essex Superior Court No. 2010-02466." She also disclosed the litigation in response to Question 4 on her Statement of Financial Affairs.

The Chapter 7 Trustee filed a Report of No Distribution on January 16, 2014.  Prior to the expiration of the deadline for filing complaints under 11 U.S.C. § 523, *see* Fed. R. Bankr. P. 4007(c), the Plaintiffs filed an adversary proceeding against the Debtor seeking to except the Debtor's obligations to them from discharge under 11 U.S.C.§ 523(a)(4).  In their Complaint, they stated:

> The Debtor is not entitled to a discharge of her obligation to the Plaintiffs inasmuch as she has been adjudicated after full trial in the Essex County Superior Court, docket number 2010-02466-A, to have committed fraud or defalcation while acting in a fiduciary capacity which resulted in the losses sustained by Plaintiffs. . . .

The Plaintiffs attached a copy of the "Findings of Fact, Rulings of Law and Order for Judgment" (the "Superior Court Judgment"), dated April 23, 2013, issued by Associate Justice James F. Lang of the Essex Superior Court, Department of the Trial Court.

The Plaintiffs, based upon the Superior Court Judgment, contend that there are no

genuine issues of material fact and that they are entitled to judgment as a matter of law. The Debtor disagrees, asserting that the issue to be precluded ("breach of fiduciary duty through 'defalcation'") was not previously litigated. She stated: "'defalcation' was never litigated, never discussed, and never decided in the state court."  In addition to their inability to show the requisite identify of issues, the Debtor argues that the Plaintiffs also cannot establish another requirement for collateral estoppel, namely, that "'defalcation' was 'essential' to the state court judgment."

The Debtor also asserts that she is entitled to summary judgment based upon the affidavit of Joseph V. Ananian, Esq. ("Attorney Ananian") who provided estate planning services to Mary Rita Barrett ("Barrett"), who was both the Debtor's aunt, as well as the Plaintiffs' aunt and whose wishes with respect to Series E United States Savings Bond standing in her name and the names of her four nieces as alternative owners are at the heart of the instant dispute.

## III. THE SUPERIOR COURT ACTION

On or around November 24, 2010, the Plaintiffs filed a Complaint against the Debtor in the Essex Superior Court.  In their Complaint, they alleged that Barrett executed a Durable Power of Attorney pursuant to which she appointed the Debtor as her attorney-in-fact.  They further alleged that at that time Barrett owned four bonds, each in the amount of $52,000.00.[1]  The bonds were held jointly between Barrett and the Debtor, Barrett and

---

[1] In actuality, as found by the Superior Court, Barrett owned more than four bonds.

Taajes, Barrett and Emery, and Barrett and Linda DiBenedetto ("DiBenedetto"),

the Debtor's sister.  According to the Plaintiffs, the Debtor "owed a fiduciary duty to act fairly

and in good faith;" was only authorized to act in the manner Barrett desired; and

"breached her fiduciary duty by liquidating two of the four bonds and distributing the

proceeds to herself and her sister . . . while liquidating the other two bonds and distributing

the proceeds for the benefit of Mary Rita Barrett." According to the Plaintiffs, Barrett had

expressed a desire to treat the Debtor, her sister and the Plaintiffs equally, yet the Debtor

"for the sake of benefitting herself and her sister, handled the liquidation of the bonds

disproportionally [sic]."  The Plaintiffs added that the Debtor engaged in "prohibited self

dealing," that she "exceeded her authority to act," and that they suffered harm as a result.

The Superior Court conducted a non-jury trial on March 20, 2013 and April 10, 2103

at which the Plaintiffs and the Debtor testified.  It issued the Superior Court Judgment,

together with detailed findings of fact and rulings of law, on April 23, 2013.  The court

initially focused on the physical and mental health of the parties' aunt, Barrett.  She was 86

and unmarried at the time of her death from advanced dementia. She had lived her entire

life in a two-family home, located in Medford, Massachusetts, that had been her family's

homestead.  Prior to her nursing home placement, she had difficulty caring for herself and

her finances, requiring her relatives to turn off her gas stove and arrange for care-givers to

assist her.

Barrett enjoyed a close relationship with her two sisters, Louise Cuddy, who had

three children, including the Debtor and DiBenedetto; and Margaret McInnis, who had four

4

children, including Taatjes and Emery.  Barrett routinely bought United States Savings Bonds.  The bonds bore her name as well as the names of one of her four nieces.  According to the Superior Court, it was her "intention in purchasing all of the bonds to eventually gift them, at some point after their maturity, to her four nieces in accordance with the listed alternative owner on each."  The court determined that while she bought more bonds for Louise Cuddy's children, it was her intention to treat the four nieces "roughly equally."  She told Taatjes on three occasions that she wanted her nieces to receive their bonds upon her death.

Barrett entered the Life Care Center of Stoneham in Stoneham, Massachusetts in July of 2003 after suffering a stroke.  Prior to that time, her sister Louise was assisting her as she was experiencing signs of dementia.  Her sister Margaret previously had been diagnosed with Alzheimer's disease and was unable to contribute to her care.  Barrett died in 2007.  According to the Superior Court, before her placement at Life Care, Barrett was confused and forgetful; her condition steadily worsened and she was uncommunicative, although she enjoyed "the unwavering support of her family."

Sometime before February 23, 2004, the Debtor, her mother Louise, Attorney Ananian and another individual visited Barrett at the nursing home.  At that time, Barrett granted Louise and the Debtor powers of attorney.  She also agreed to the creation of a realty trust into which her Medford home would be transferred.  Barrett designated her sisters as the beneficiaries of the trust.  According to the Superior Court, Barrett intended to divide her most significant asset equally between the families of her two sisters.

5

Attorney Ananian, who the Superior Court found was hired by the Debtor, drafted the documents.  Barrett executed a General Durable Power of Attorney on February 24, 2004, and a trust document establishing the Mary Rita Fellsway Trust on  March 13, 2004.[2]  The Debtor and her mother were named as trustees and 50% beneficiaries.  On March 13, 2004, Barrett executed a quitclaim deed conveying her home to the trust for a consideration of $1.  Attorney Ananian notarized the deed.[3]

According to the Superior Court, the Debtor testified that, at the nursing home, Barrett stated that she wanted the Debtor and DiBenedetto to keep the savings bonds bearing their names and that she wanted the Debtor to cash the other bonds bearing the Plaintiffs' names and use them to fund her nursing home expenses.  The Superior Court found that the Debtor's testimony was incredible for a number of reasons.  Specifically, the court rejected the Debtor's testimony as contrary to the Plaintiffs' credible testimony and Barrett's medical records which established that Barrett's mental acuity was adversely affected by her stroke and dementia.  In view of the absence of a writing directing the disposition of the bonds in the manner asserted by the Debtor, and the likelihood that the Plaintiffs would conclude that the Debtor was exerting undue influence over Barrett, the court stated: "[t]he potential appearance of self-dealing was so obvious that it could not

---

[2] The Plaintiffs attached a copy of the trust document to their papers.  The Mary Rita Fellsway Trust was a nominee trust.

[3] Attorney Ananian in his affidavit, the contents of which are set forth below, indicated that Barrett had executed a simple will.  The Superior Court did not address that will or the manner in which Barrett proposed to dispose of her assets through that will.

have escaped Maggio's comprehension, and she would have sought the protection of clear

documentation that she was acting at Mary Rita's direction."  The court added:

> Not only did Maggio not seek to memorialize in some fashion Mary Rita['s]
> supposed decision about the bonds, but *she affirmatively sought to keep it from
> her McInnis cousins, and, when confronted about it, she lied.*  After Taatjes
> learned from Louise that Maggio and DiBenedetto had taken their bonds
> and that she and Emery were supposed to receive theirs, Taatjes called Maggio
> and inquired. Maggio replied, "I don't know anything about bond money.
> I didn't get any bond money."  *The false denial reflects consciousness of guilt on
> her part that is inconsistent with having merely followed the expressed wishes of
> Mary Rita.*  So too does her subsequent statement to Taatjes in the same
> phone conversation, "Patty, I can't believe I have gotten myself into this
> mess."

(emphasis supplied).  The court, while noting that Barrett might have elected to treat the

Debtor differently than her other nieces, determined that it made no sense and "smack[ed]

of a decision made by her sister, Maggio" for Barrett to favor DiBenedetto who had moved

to New York and rarely saw her aunt.  Thus, the court reiterated its conclusion that Barrett

"did not tell Maggio that she and DiBenedetto should keep the bonds bearing their names

and that the the McInnis bonds should be cashed to pay for her care."

The court also found that Maggio was involved in marketing and selling Barrett's

home in July of 2004 for which the real estate trust in which it was held received

$471,310.90.  The Debtor received $30,000 for her role in the sale.  In March of 2005, about

a year after becoming attorneys-in-fact, the Debtor and her mother removed bonds from

Barrett's safety deposit box and began cashing them.  On March 28, 2005, they cashed all

the bonds bearing the names of Emery and Taatjes, receiving a total of $84,924.64

(approximately $42,000 each).  The bonds with the Debtor's name and that of her sister

totaled approximately $108,000. The Debtor converted her bonds to H series bonds and gave DiBenedetto the proceeds of her bonds.

According to the Superior Court, the Debtor and her mother opened a checking account in Barrett's name with access limited to them.  The stated purpose of the account was to pay Barrett's bills.  At the time of her death, there was in excess of $100,000 in the account which was distributed to Barrett's sister and the Debtor's mother, Louise.

Barrett's nursing home care was costly.  For her nearly four-year stay, her expenses totaled approximately $365,000.  Although the Debtor testified that the proceeds of the Plaintiffs' bonds was needed for Barrett's care, "they were neither needed nor used for that purpose, but instead were appropriated by Maggio and/or Louise." The court reasoned that Barrett had substantial savings and certificates of deposit at the time she entered Life Care and that the Debtor's testimony that she cashed bonds in Barrett's name and the names of other relatives in addition to the Plaintiffs and deposited the proceeds in the joint checking account, was not credible, particularly in the absence of any documentation as to the existence of such bonds and evidence that Barrett's assets were exhausted, particularly where there was a $100,000 surplus in Barrett's estate that went to the Debtor's mother upon Barrett's death.  Thus, the court concluded that the proceeds from the Plaintiffs' bonds were not used to pay Barrett's bills but went to the Cuddy family "either via the passing of the joint checking account proceeds to Louise at the time of Mary Rita's death, or otherwise."

Based upon its findings, the Superior Court determined that the Debtor breached

8

her fiduciary duty to Barrett.  It set forth the applicable law as follows:  "A claim of breach

of fiduciary duty involves three elements:  the existence of a fiduciary relationship, a breach

of the resulting fiduciary duty, and resulting harm."  It added that only the second element

was at issue. Citing Mass. Gen. Laws ch. 201B, § 1(a),[4] and <u>Gagnon v. Coombs</u>, 39 Mass.

App. Ct. 144, 154 (1995), it determined that the power of attorney "'created . . . a traditional

principal-agent relationship.  That relationship has one supreme characteristic: as [Mary

Rita's agent, [the defendant] stood in a fiduciary relationship to [Mary Rita] with respect

to all matters within the scope of the agency."  The court concluded Barrett breached her

fiduciary duty and entered judgment in favor of the Plaintiffs in the sum of $84,924.64, plus

interests and costs.  Maggio appealed.  She has not prosecuted the appeal, however, and

the Plaintiffs did not seek relief from the automatic stay to pursue the appellate proceeding.

---

[4] The Uniform Durable Power of Attorney Act was repealed effective January 15,
2009. According to the court in <u>Guardianship of Smith</u>:

> General Laws c. 201B, § 1( a ), as inserted by St.1981, c. 276, § 2, provides:
> "A durable power of attorney is a power of attorney by which a principal,
> in writing, designates another as his attorney in fact and the writing
> contains the words, 'This power of attorney shall not be affected by
> subsequent disability or incapacity of the principal,' or 'This power of
> attorney shall become effective upon the disability or incapacity of the
> principal,' or similar words showing the intent of the principal that the
> authority conferred shall continue notwithstanding the subsequent
> disability or incapacity of the principal."

43 Mass. App. Ct.493, 684 N.E.2d 613, 614 n. 1 (1997).  The statutory provisions defining
and authorizing a durable power of attorney are now contained in Mass. Gen. Laws ch..
190B, §§ 5-501 to 5-507.

## IV. THE ATTORNEYS' AFFIDAVITS

In support of her Opposition to the Plaintiffs' Motion for Summary Judgment and in support of her Cross-Motion for Summary Judgment, the Debtor submitted the affidavit of Attorney Ananian,  a member of the National Academy of Elder Law Attorneys since 1998 and whose law firm, located in Saugus, Massachusetts, is named the Elder Law Center.  Although Attorney Ananian intimated that he was retained to represent Barrett, the Superior Court determined that he was engaged by Maggio.

In his affidavit, Attorney Ananian stated:

In January, 2004 I was retained to provide legal services to Mary Rita Barrett, who had entered a nursing home due to her declining health.  My assignment was to develop a specific plan for the disposition of Ms. Barrett's assets and the preservation of those assets. In later 2003 or early 2004, Mary Rita Barrett had executed a simple will, which I did not prepare.

\*\*\*

On her own and with a clear understanding of the consequences, Ms. Barrett decided to fund her nursing home stay by cashing in the lion's share of her U.S. Savings Bonds. This would accomplish her further objective of providing an inheritance for her two sisters as the beneficiaries of the real estate trust into which we would transfer her residence.

\*\*\*

I met with Mary Rita Barrett on several occasions to develop and carry out this estate plan. These meetings occurred in the presence of her sister, Louise Cuddy at the Life Care Center of Stoneham. I was aware that Louise Cuddy visited Mary Rita on a daily basis and did all of Ms. Barrett's laundry and provided daily companionship to Ms. Barrett.

On topics related to her finances, I found Ms. Barrett to have a detailed knowledge of the nature and extent of her assets. She knew what she owned and she knew what she wanted to accomplish, i.e., to provide a bequest to

10

her sisters Louise Cuddy and Margaret McInnis, and to liquidate enough assets to meet her obligations to the nursing home.

. . . Ms. Barrett's savings bonds had been purchased by her incrementally over the course of at least twenty (20) years. When each bond was purchased, she purchased it in her own name and named another relative as beneficiary upon her death. In my presence, Ms. Barrett gave specific instructions that she wanted her sister, Louise Cuddy and Louise Cuddy's two (2) daughters, Julia Maggio and Linda DiBennedetto, to be given those savings bonds in which they had a survivor's interest. The liquidation of the other savings bonds provided sufficient funds to address her income taxes related to the sale of the bonds and payment of the three years of long-term care, the disqualification period. Ms. Barrett had expressed this desire on more than one occasion, explaining that decision as a way to take care of those who had taken care of her. Once she had decided to give each sister a one-half interest in the Mary Rita Barrett Fellsway Trust, Ms. Barrett decided to liquidate all of her savings bonds.

***

. . . I am also certain that the cashing in of Mary Rita Barrett's U.S. Savings Bonds was done at her express direction.

. . . In connection with my representation of her, I prepared a General Durable Power of Attorney, a Health Care Proxy and The Mary Rita Barrett Fellsway Trust.  Mary Rita Barrett signed each document with full knowledge of both its contents and its legal consequences.  Even though she could no longer live independently, I am certain that Mary Rita Barrett understood clearly everything she intended to accomplish in creating her estate plan. . . .

. . .  I am also certain that the cashing in of Mary Rita Barrett's U.S. Savings Bonds was done at her express direction.

In Opposition to the Debtor's Motion for Summary Judgment, the Plaintiffs

submitted the affidavit of Attorney Thomas J. Delaney ("Attorney Delaney"), who

represented them in the Superior Court action, together with Barrett's medical records.  In

his affidavit, Attorney Delaney referenced the "volume of evidence" that was presented

11

at the trial in the Superior Court regarding Barrett's ability to comprehend her actions in

executing documents in 2003 and 2004 and that that evidence "directly contradicts

Attorney Ananian's memory."  He represented that following her admission to the Life

Care Center in Stoneham, Massachusetts, Barrett was diagnosed as having had a cerebral

stroke and as having Alzheimer's disease.  Through 2004, and at the time Attorney

Ananian notarized Barrett's signature on the deed of trust and Barrett executed the power

of attorney naming the Debtor as her attorney-in fact, medical staff at the Life Care Center

consistently and repeatedly reported that Barrett was alert but confused.

## V. APPLICABLE LAW

### A. Section 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code excepts from discharge any debt "for fraud

or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. §

523(a)(4).  "To except a debt from discharge under § 523(a)(4) for defalcation while acting

in a fiduciary capacity, a creditor must show by a preponderance of the evidence that: (1)

the debt results from a fiduciary's fraud or defalcation under an "express" or "technical

trust"; (2) the debtor acted in a fiduciary capacity with respect to that trust; and (3) the debt

was caused by a fraud or defalcation within the meaning of bankruptcy law." Stallworth

v. McBride (In re McBride), 512 B.R. 103, 113 (Bankr. D. Mass. 2014) (citing Raso v. Fahey

(In re Fahey), 482 B.R. 678, 687 (B.A.P. 1st Cir. 2012)). Federal law determines whether a

fiduciary relationship exists under § 523(a)(4). Id. (citing In re Fahey, 482 B.R. at 687; and

Blyler v. Hemmeter (In re Hemmeter), 242 F.3d 1186, 1189 (9th Cir. 2001)). *See also* Breed's

<u>Hill Ins. Agency, Inc. v. Fravel ( In re Fravel)</u>, 485 B.R. 1, 14 (Bankr. D. Mass. 2013). In

<u>Fravel</u>, this Court, citing, *inter alia,* <u>In re Fahey</u>, observed:

> The requirement of an express trust requires "an explicit declaration of trust, a clearly defined trust res, and an intent to create a trust relationship." <u>Id.</u> (citing <u>Gehlhausen v. Olinger (In re Olinger)</u>, 160 B.R. 1004, 1014 (Bankr. S.D. Ind. 1993) (internal quotations and citations omitted); <u>LaPointe v. Brown (In re Brown)</u>, 131 B.R. 900, 905 (Bankr. D. Me. 1991)). In contrast, a technical trust " 'arises under statute or common law.' " <u>Fahey</u>, 482 B.R. at 688 (quoting <u>In re D'Abrosca</u>, 2011 WL 4592338, at *5; <u>Farley v. Romano (In re Romano)</u>, 353 B.R. 738 (Bankr. D. Mass. 2006); <u>M–R Sullivan Mfg. Co. v. Sullivan (In re Sullivan)</u>, 217 B.R. 670, 674 (Bankr. D. Mass. 1998); <u>Collenge v. Runge (In re Runge)</u>, 226 B.R. 298, 305 (Bankr. D. N.H. 1998)). Additionally, according to the Bankruptcy Appellate Panel in <u>Fahey</u>, "[w]here the basis for the existence of a technical trust is statutory, the statute must '(1) define[ ] the trust res, (2) spell[ ] out the trustee's fiduciary duties, and (3) impose[ ] a trust prior to and without reference to the wrong that created the debt.' " 482 B.R. at 488 (citing <u>Stowe v. Bologna (In re Bologna)</u>, 206 B.R. 628, 632 (Bankr. D. Mass. 1997)).

<u>In re Fravel</u>, 485 B.R. at 14.

Recently, in <u>Bullock v. BankChampaign, N.A.</u>, __ U.S. __, 133 S.Ct. 1754 (2013), the

United States Supreme Court resolved a split among the circuits as to the requisite mental

state pertinent to a defalcation. The Court observed that the petitioner was, in effect,

asking it "to decide whether the bankruptcy term "defalcation" applies "'in the absence of

any specific finding of ill intent or evidence of an ultimate loss of trust principal.'" 133 U.S.

at 1758. The Court stated:

> The lower courts have long disagreed about whether "defalcation" includes a scienter requirement and, if so, what kind of scienter it requires. *Compare* <u>In re Sherman</u>, 658 F.3d 1009, 1017 (9th Cir. 2011) ("defalcation" includes "even innocent acts of failure to fully account for money received in trust" (internal quotation marks and brackets omitted)), *with* <u>In re Uwimana</u>, 274 F.3d 806, 811 (4th Cir. 2001) (defalcation occurs when "negligence or even an innocent mistake . . . results in misappropriation"), *with* 670 F.3d, at 1166

("defalcation requires . . . conduct [that] can be characterized as objectively reckless"), and *with* In re Baylis, 313 F.3d 9, 20 (1st Cir. 2002) ("defalcation requires something close to a showing of extreme recklessness"). In light of that disagreement, we granted the petition.

Bullock, 133 S.Ct. at 1758.

Thus, in Bullock, the Supreme Court established the requisite mental culpability for defalcation under § 523(a)(4), stating: "In resolving these differences, we note that this longstanding disagreement concerns state of mind, not whether "defalcation" can cover a trustee's failure (as here) to make a trust more than whole. We consequently shall assume without deciding that the statutory term is broad enough to cover the latter type of conduct and answer only the "state of mind" question." Id. at 1759.  Relying upon Neal v. Clark, 95 U.S. 704, 709 (1978), it held that the term "defalcation" "must include "a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase," adding "[w]e describe that state of mind as one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." Id. at 1757.[5]

---

[5] The Supreme Court elaborated:

[W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985). *See* id., § 2.02 Comment 9, at 248

14

B. <u>Collateral Estoppel</u>

The principles pertinent to application of collateral estoppel are well known.  In <u>The Law Offices of Miriam G. Altman, P.C. v. Johnson (In re Johnson)</u>, 445 B.R. 50 (Bankr. D. Mass. 2011), this Court stated:

> "'Under the full faith and credit statute, 28 U.S.C. § 1738, a judgment rendered in a state court is entitled to the same preclusive effect in federal court as it would be given within the state in which it was rendered.'" <u>Silva v. Commonwealth of Massachusetts Land Court</u>, 351 Fed.Appx. 450, 457–58 (1st Cir.2009) (quoting <u>Giragosian v. Ryan</u>, 547 F.3d 59, 63 (1st Cir. 2008), *cert. denied*, 556 U.S. 1184, 129 S.Ct. 2020, 173 L.Ed.2d 1088 (2009)). "'Massachusetts recognizes two distinct types of preclusion arising out of the maintenance of prior litigation: res judicata (claim preclusion) and collateral estoppel (issue preclusion).'" <u>Silva</u>, 351 Fed.Appx. at 458 (quoting <u>Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co.</u>, 547 F.3d 48, 52 (1st Cir. 2008)).

According to the First Circuit in <u>Silva</u>,

> T]he Supreme Judicial Court recently stated that issue preclusion applies when (1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication. Additionally, [4] the issue decided in the prior adjudication must have been essential to the earlier judgment.

---

(explaining that the Model Penal Code's definition of "knowledge" was designed to include 'wilful blindness'"). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." <u>Id.</u>, § 2.02(2)(c), at 226 (emphasis added). *Cf.* <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (defining scienter for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").

<u>Bullock</u>, 133 S.Ct. at 1759-60.

> Massachusetts courts also require that [5] appellate review must have been available in the earlier case before issue preclusion will arise.

351 Fed.Appx. at 458–59 (citations omitted). With respect to the final element, the Massachusetts Supreme Judicial Court in O'Brien v. Hanover Ins. Co., 427 Mass. 194, 692 N.E.2d 39 (1998), held:

> The doctrine of issue preclusion requires a judgment to be "final" before that judgment can have preclusive effect. Cousineau v. Laramee, 388 Mass. 859, 863 n. 4, 448 N.E.2d 756 (1983). We have not yet decided whether a judgment by a lower court should be considered final for this purpose while it is on appeal. *See* Massachusetts Prop. Ins. Underwriting Ass'n v. Norrington, 395 Mass. 751, 754, 481 N.E.2d 1364 (1985) (assuming, without deciding, that although an appeal from an insured's conviction was pending in the Appeals Court, his conviction constituted final judgment for issue preclusion purposes). The Federal rule, followed by a majority of the States, is that a trial court judgment is final and has preclusive effect regardless of the fact that it is on appeal. *See, e.g.*, Southern Pac. Communications Co. v. American Tel. & Tel. Co., 740 F.2d 1011, 1018–1019 (D.C.Cir.1984); Bartlett v. Pullen, 586 A.2d 1263, 1265 (Me.1991). That rule is also favored by the Restatement (Second) of Judgments § 13 comment f (1982). *But see, e.g.*, Sandoval v. Superior Court, 140 Cal.App.3d 932, 936–937, 190 Cal.Rptr. 29 (1983); Petition of Donovan, 137 N.H. 78, 81, 623 A.2d 1322 (1993). We are persuaded by the majority rule.

427 Mass. at 200–201, 692 N.E.2d 39.

In re Johnson, 445 B.R. 60-61 (footnote omitted). *See also* Unger v. Lambert (In re Lambert),

459 B.R. 519, 523 (Bankr. D. Mass. 2011).

C. Summary Judgment Standard

Like the elements required to apply collateral estoppel, the summary judgment

standard requires little explication in the context of this adversary proceeding.  In Weiss

v. Wells Fargo Bank, N.A. (In re Kelley), 498 B.R. 392 (B.A.P. 1st Cir. 2013), the United

States Bankruptcy Appellate Panel of the First Circuit stated:

> "In bankruptcy, summary judgment is governed in the first instance by
> Bankruptcy Rule 7056." Desmond v. Varrasso (In re Varrasso), 37 F.3d 760,
> 762 (1st Cir.1994). "By its express terms, the rule incorporates into
> bankruptcy practice the standards of Rule 56 of the Federal Rules of Civil
> Procedure." Id.; *see also* Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56. "It is
> apodictic that summary judgment should be bestowed only when no
> genuine issue of material fact exists and the movant has successfully
> demonstrated an entitlement to judgment as a matter of law." In re Varrasso,
> 37 F.3d at 763 (citing Fed. R. Civ. P. 56(c)). The "mere existence of some
> alleged factual dispute between the parties will not defeat an otherwise
> properly supported motion for summary judgment; the requirement is that
> there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc.,
> 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In re Kelley, 498 B.R. at 397 (footnote omitted). *See also* Lowell Dev. and Fin. Corp. v.

Winter Hill Bank, FSB ( In re Natale), 508 B.R. 790, 799–800 (Bankr. D. Mass. 2014).

**VI. DISCUSSION**

A. The Plaintiffs' Motion for Summary Judgment

The first issue is whether the pendency of the appeal precludes the Court from

determining whether collateral estoppel may apply.  Based upon the decision in O'Brien

v. Hanover Ins. Co., 427 Mass. 194, 692 N.E.2d 39 (1998), the Court concludes it does not.

The second issue that the Court must address is whether the Superior Court's findings of

fact establish the requisite elements of a claim under § 523(a)(4).  Because there was a final

judgment and the parties are identical, the Court must evaluate whether the issues

addressed by the Superior Court case are identical to the issues in this case.

In this proceeding under section 523(a)(4), as noted above,  the Court initially must

find the existence of an express or technical trust.  Second, the Debtor must have acted in a fiduciary capacity with respect to the trust, and, lastly, the debt must have arisen from fraud or defalcation while acting in a fiduciary capacity, which requires proof that the Debtor had "knowledge of, or [acted with] gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." Bullock, 133 S.Ct. at 1757.  These issues do not coincide with the issues addressed in the state court action, namely 1) the existence of a fiduciary relationship; 2)  a breach of the resulting fiduciary duty, and 3) resulting harm. Accordingly, as explained in detail below, the state court judgment is not entitled to collateral estoppel effect.

The Court concludes that the durable power of attorney in favor of the Debtor and her mother, which the Superior Court found to have been executed by Barrett, created a fiduciary relationship between the Debtor and Barrett under state law. Whether a relationship is a fiduciary relationship within the meaning of 11 U.S.C. § 523(a)(4), however, is a matter of federal law.  As noted by the court in D'Angelo v. McKean (In re McKean, No. 11-23743, Adv. P. No. 12-6018, 2014 WL 184983 (Bankr. D. Kan. Jan. 15, 2014), "[f]or purposes of section 523(a)(4), the definition of 'fiduciary' is narrowly construed, meaning that the applicable nonbankruptcy law that creates a fiduciary relationship must clearly outline the fiduciary duties and identify the trust property." Id. at *4 (footnote omitted).  Noting the need for an express or technical trust for a fiduciary relationship to exist under section 523(a)(4), the court stated: "not all fiduciary relationships which exist under common law or state law rise to the level actionable under § 523(a)(4)." Id.

18

In _Gagnon v. Coombs_, 39 Mass. App. Ct. 144, 654 N.E.2d 54 (1995), *review denied*, 421 Mass. 1106 (1995), the court determined that a power of attorney creates a traditional principal-agent relationship, adding that that relationship has one supreme characteristic, namely that the agent stands in a fiduciary relation to the principal with respect to all matters within the scope of the agency. Id. (citing Restatement (Second) of Agency §§ 1, 13, 375). *See also* _Perez v. First Option Mortg. Corp. (In re Perez)_, No. 08-40693-JBR, Adv. P. No. 08-4081, 2008 WL 4164372 (Bankr. D. Mass. Sept. 3, 2008).

In _Allen v. Scott (In re Scott)_, 481 B.R. 119 (Bankr. N.D. Ala. 2012), the court observed that as a general rule a power of attorney does not give rise to the fiduciary capacity required by section 523(a)(4) unless the debtor has a sufficiently elevated level of fiduciary duty. Id. *See also* _Valley Memorial Home v. Hrabik (In re Hrabik)_, 330 B.R. 765, 773 (Bankr. D. N.D. 2005). In _Hrabik_, the court determined the debtor's duty was sufficiently elevated to the level of a fiduciary duty necessary under section 523(a)(4) because the power of attorney expressly stated that it was to be used solely for his mother's benefit and exercised only in a fiduciary capacity. Id.

While the power of attorney executed by Barrett may have established a fiduciary relationship, without a copy of the durable power of attorney, this Court cannot determine the scope and extent of the Debtor's agency, whether the fiduciary duty established by the power of attorney was elevated vis à vis the bonds standing in the joint names of Barrett and Emery, and Barrett and Taatjes, and, thus, whether the duties imposed on the Debtor were sufficiently elevated to satisfy the requirements of section 523(a)(4). In particular, the

19

Court is unable to unequivocally find the existence of an express or technical trust. Accordingly, the Superior Court's finding of a fiduciary relationship between Barrett and the Debtor is not entitled to collateral estoppel effect because it was predicated upon state law. Moreover, the state court made no findings of a trust agreement pertinent to the Savings Bonds, and the Plaintiffs did not point to evidence that would enable a finding of a technical trust.

In addition to absence of a copy of the power of attorney in the summary judgment record, the Court is mindful that the Debtor owed Bennett, not the Plaintiffs, a fiduciary duty under state law. *See* Charles Cnty. Nursing and Rehab. Ctr. v. Marbury (In re Marbury), No. 09-13017PM, Adv. P. No. 09-0214, 2009 WL 4639599 (Bankr. D. Md. Dec. 2, 2009). In that case, the court, observing that the plaintiff's complaint failed to state claim under section 523(a)(4), stated:

> The reason for the failure can be summed up in this short quote from a leading text: "[F]or the debt to be nondischargeable under section 523(a)(4), it must be directly related to the fiduciary relationship between the debtor and the creditor." *Collier on Bankruptcy* ¶ 523.10[1][d] at 523–74 (15th ed. rev.2009). . . ."A threshold inquiry is whether a fiduciary obligation runs from the debtor to the creditor." In re House, 2007 WL 2126260 *3 (BC N.D. Ill.)[, *aff'd*, 2007 WL 2908815 (N.D. Ill. Oct. 4, 2007)]. Put another way, a plaintiff must prove two elements: a fiduciary relationship between it and the debtor and fraud or defalcation committed by the debtor in the course of that fiduciary relationship. Young v. Fowler Bros., 91 F.3d 1367, 1371 (CA1 0 1996); Lexington Health Care Ctr. of Elmhurst, Inc., v. McDade, 282 B.R. 650, 658–659 (B.C. N.D. Ill. 2002); In re Hogue, 221 B.R. 786, 793 (B.C.N.D. Okla. 1998).

In re Marbury,  2009 WL 4639599 at *2.

While the state court determined that the Debtor's breach of her duties to Bennett

injured the Plaintiffs, the Superior Court did not address the issue of whether the Debtor also owed her cousins, the Plaintiffs, fiduciary duties. Thus, it would appear that the power of attorney only created a fiduciary relationship between Barrett and the Debtor, and the fact that the Debtor had a fiduciary duty to Barrett, on the existing record, does not bootstrap that duty to third-party creditors of the person owed the duty or the Debtor. *See* Altercare of Navarre Ctr. for Rehab. & Nursing Care, Inc. v. Donley (In re Donley), 2014 WL 1577236 at *11 (Bankr. N.D. Ohio April 17, 2014); Silver Care Ctr. v. Parks (In re Parks), No. 05-371544, Adv. P. No. 05-2774, 2007 WL 2033380 at *15 (Bankr. D. N.J. July 102, 2007); Lexington Health Care Ctr. of Elmhurst v. McDade (In re McDade), 282 B.R. 650, 660 (Bankr. N.D. Ill. 2002).

B. The Debtor's Motion for Summary Judgment

The Debtor's Motion for Summary Judgment is predicated upon Attorney Ananian's affidavit. Attorney Ananian's affidavit was contradicted by that of Attorney Delaney . Moreover, the medical records submitted by the Plaintiffs, as well as the Superior Court's factual findings, fail to provide any corroborating evidence whatsoever to Attorney Ananian's representation that Barrett was capable of having a clear understanding of her estate plan. Accordingly, the Court finds that the Debtor failed to establish the absence of genuine issues of material fact that would permit allowance of her Motion for Summary Judgment.

21

## VII. CONCLUSION

Upon consideration of the foregoing, the Court shall enter an order denying the Plaintiffs' Motion for Summary Judgment.  The Court concludes that collateral estoppel cannot be used to establish that any debt owed by the Debtor to the Plaintiffs as a result of the state court judgment is nondischargeable under section 523(a)(4).  The Court also denies the Debtor's Motion for Summary Judgment.  The Court concludes that genuine issues of material fact exists that preclude entry of summary judgment in favor of the Debtor.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated:  September 22, 2014