# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**JULIA A. MAGGIO,**                                    Chapter 7
     Debtor                              Case No. 13-16257-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**PATRICIA TAATJES** and
**MAUREEN EMERY**,
     Plaintiffs
v.                                                     Adv. P. No. 14-1025
**JULIA A. MAGGIO**,
     Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Motion for Summary Judgment filed by the

Debtor/Defendant, Julia A. Maggio ("Maggio" or the "Debtor"), pursuant to which she

seeks summary judgment with respect to the Complaint filed against her by the Plaintiffs,

Patricia Taatjes ("Taatjes") and Maureen Emery ("Emery")(jointly, the "Plaintiffs").  The

Court heard the Motion for Summary Judgment on June 9, 2015 and took the motion under

advisement.  The issue presented is whether the Plaintiffs have established the existence of

a genuine issue of material fact as to the existence of a fiduciary relationship between the

Plaintiffs and Maggio for purposes of excepting their debt from discharge under 11 U.S.C.

§ 523(a)(4), warranting denial of Maggio's Motion for Summary Judgment.  For the reasons

set forth below, the Court concludes that the Plaintiffs have not sustained their burden and

the Debtor is entitled to the entry of an order granting her Motion.

## II. PROCEDURAL BACKGROUND[1]

The Debtor filed a voluntary Chapter 7 petition on October 25, 2013.  On Schedule F-

Creditors Holding Unsecured Nonpriority Claims, the Debtor listed the Plaintiffs as the

holders of claims in the sum of $125,000 arising out of a "2013 Court Judgment - Now on

Appeal Essex Superior Court No. 2010-02466." She also disclosed the litigation in response

to Question 4 on her Statement of Financial Affairs.

The Chapter 7 Trustee filed a Report of No Distribution on January 16, 2014.  Prior

to the expiration of the deadline for filing complaints under 11 U.S.C. § 523, *see* Fed. R.

Bankr. P. 4007(c), the Plaintiffs filed an adversary proceeding against the Debtor seeking to

except the Debtor's obligations to them from discharge under 11 U.S.C.§ 523(a)(4).  In their

Complaint, they stated:

> The Debtor is not entitled to a discharge of her obligation to the Plaintiffs
> inasmuch as she has been adjudicated after full trial in the Essex County
> Superior Court, docket number 2010-02466-A, to have committed fraud or
> defalcation while acting in a fiduciary capacity which resulted in the losses
> sustained by Plaintiffs. . . .

---

[1] The Court incorporates portions of its prior decision, <u>Taajes v. Maggio (In re Maggio)</u>, 518 B.R. 179 (Bankr. D. Mass. 2014),  for purposes of determining Maggio's present Motion for Summary Judgement.

The Plaintiffs attached a copy of the "Findings of Fact, Rulings of Law and Order for Judgment" (the "Superior Court Judgment"), dated April 23, 2013, issued by Associate Justice James F. Lang of the Essex Superior Court, Department of the Trial Court.

In 2014, the Plaintiffs, based upon the Superior Court Judgment, filed a Motion for Summary Judgment, contending that there were no genuine issues of material fact and that they were entitled to judgment as a matter of law.  The Debtor filed a Cross-Motion for Summary Judgment,  asserting that the issue to be precluded ("breach of fiduciary duty through 'defalcation'") was not previously litigated and stating:  "'defalcation' was never litigated, never discussed, and never decided in the state court."

The Debtor, in her first Motion for Summary Judgment asserted that she was entitled to summary judgment based upon the affidavit of Joseph V. Ananian, Esq. ("Attorney Ananian") who provided estate planning services to Mary Rita Barrett ("Barrett"), who was both the Debtor's aunt, and the Plaintiffs' aunt and whose wishes with respect to Series E United States Savings Bonds standing in her name and the names of her four nieces as alternative owners are at the heart of the instant dispute.

On September 9, 2014, this Court issued a Memorandum and Order denying the Cross-Motions for Summary Judgment.  It stated:

> The Court concludes that collateral estoppel cannot be used to establish that any debt owed by the Debtor to the Plaintiffs as a result of the state court judgment is nondischargeable under section 523(a)(4).  The Court also denies the Debtor's Motion for Summary Judgment.  The Court concludes that genuine issues of material fact exists that preclude entry of summary judgment in favor of the Debtor.

Taajes v. Maggio (In re Maggio), 518 B.R. 179, 191 (Bankr. D. Mass. 2014).

## III. FACTS

A. <u>Undisputed Facts</u>

Following denial of the Cross-Motions for Summary Judgment, the Court issued an

Amended Pretrial Order, requiring the submission of a Joint Pretrial Memorandum.  The

parties complied with the Court's order, and, on March 20, 2015, filed their Joint Pretrial

Memorandum.  In that document, the parties stipulated to the following facts:

1.  Mary Rita Barrett ("Barrett") was born on September 28, 1920.
2. Barrett died on March 9, 2007 at the age of 86.
3. Barrett was never married.
4. Barrett did not have any children.
5. Margaret McInnis and Louise Cuddy were Barrett's sisters.
6. Margaret McInnis died on December 20, 2007.
7. Louise Cuddy resides in Medford, MA.
8. The Plaintiffs are daughters of McInnis and nieces of Barrett.
9. The Debtor and her sister, Linda DeBenedetto  [sic] are daughters of Louise
Cuddy and nieces of Barrett.
10. On or about February 23, 2004 Barrett executed a General Durable Power
of Attorney naming Maggio and Louise Cuddy as her attorneys-in-fact.
11. On or about March 13, 2004, the Mary Rita Fellsway Trust was established
with Louise Cuddy and Maggio designated as Trustees.
12. On or about March 13, 2004, the beneficiaries of the Mary Rita Fellsway
Trust were Louise Cuddy (50%) and Margaret McInnis (50%).
13. On or about July 22, 2004, the Mary Rita Fellsway Trust sold Barrett's
former residence at 898 Fellsway, Medford to a third party.
14. When Barrett purchased the Treasury Bonds, she frequently titled the
Bonds both in her name or the name of a given relative.  For example, a bond
may have been titled "Mary Rita Barrett or Julia Maggio."

On April 10, 2015, Maggio filed a second Motion for Summary Judgment.  In support

of her Motion, she filed her affidavit, the affidavit of Attorney Ananian, who, as noted

above, provided legal services to Barrett, a copy of a "General Durable Power of Attorney

of Mary R. Barrett," and a memorandum of law.  The Plaintiffs filed an Opposition to the

4

Motion, incorporating the Findings of Fact, Rulings of Law and Order for Judgment, together with the Judgment, issued on April 23, 2013, and the Affidavit of Thomas J. Delaney ("Attorney Delaney"), both of which were previously filed with the Court, and a memorandum of law.

B. The Affidavits

1. The Debtor

The Debtor, in her affidavit, stated that she and her mother, Louise Cuddy ("Cuddy"), provided "care and assistance" to Barrett as she grew older.  She stated that, beginning in 2003, she and her mother, at Barrett's request, began to assist Barrett in the management of her financial affairs; that she and her mother assisted Barrett in locating an assisted living facility; and that in early 2004 Barrett retained Attorney Ananian of the Elder Law Center in Saugus, Massachusetts, "to develop a plan that would permit Mary Rita to reside at and receive long-term care permanently at the Life Care Center of Stoneham."  She attested that Barrett moved to the Life Care Center in 2004 and that, at a meeting at the Life Care Center in early 2004, which she, Cuddy and Attorney Ananian attended,

> Mary Rita requested that we sell all of her savings bonds, in order to provide sufficient funds to pay for her long-term care at Life Care Center of Stoneham and the income taxes related to the sale of the bonds, provided that Mary Rita specifically instructed that she wanted her sister, Louise Cuddy, my sister, Linda DiBenedetto, and myself, to be given those savings bonds in which each of us had a survivor's interest.  This we did, and the liquidation of the other savings bonds provided sufficient funds for payment of Mary Rita's taxes and the substantial expenses of Mary Rita's care at the Life Care Center of Stoneham, until Mary Rita's death in 2007.

Maggio also attested to the execution by Barrett of the General Durable Power of Attorney,

5

which Attorney Ananian prepared.

### 2. Attorney Ananian

Attorney Ananian, in his affidavit, stated that he was retained in January of 2004 "to provide legal services to Mary Rita Barrett, who had entered a nursing home due to her declining health" and that his assignment was "to develop a specific plan for the disposition of Ms. Barrett's assets and the preservation of those assets." In conjunction with that assignment, he prepared an advanced directive for Barrett's health care and business decisions, he represented her in the sale of her home, and he developed a plan "to preserve her assets consistent with existing MassHealth qualification regulations," noting that Barrett's primary assets were her home at 898 Fellsway, Medford, certificates of deposit, and U.S. Savings bonds. He noted that the initial base cost to Barrett at the Life Care Center of Stoneham was $8,600.00 per month, exclusive of add-ons, that Barrett received approximately $1,600.00 per month from Social Security and pension income, and that she would need as much as $350,000.00 to pay for her placement until she became MassHealth eligible. He further stated:

> In several meetings with Ms. Barrett, I explained to her that her combined liquid assets were more than sufficient to pay for three years of nursing home care. She decided that she would convey her residence into a Trust, naming her two (2) then survivng siblings . . . as beneficiaries, and that she would fund the nursing home cost by cashing in her savings bonds.

> On her own and with a clear understanding of the consequences, Ms. Barrett decided to fund her nursing home stay by cashing in the lion's share of her U.S. Savings Bonds. This would accomplish her further objective of providing an inheritance for her two sisters as the beneficiaries of the real estate trust into which we would transfer her residence.

***

I met with Mary Rita Barrett on several occasions to develop and carry out this estate plan. These meetings occurred in the presence of her sister, Louise Cuddy at the Life Care Center of Stoneham. I was aware that Louise Cuddy visited Mary Rita on a daily basis and did all of Ms. Barrett's laundry and provided daily companionship to Ms. Barrett.

On topics related to her finances, I found Ms. Barrett to have a detailed knowledge of the nature and extent of her assets. She knew what she owned and she knew what she wanted to accomplish, i.e., to provide a bequest to her sisters Louise Cuddy and Margaret McInnis, and to liquidate enough assets to meet her obligations to the nursing home.

. . . Ms. Barrett's savings bonds had been purchased by her incrementally over the course of at least twenty (20) years. *When each bond was purchased, she purchased it in her own name and named another relative as beneficiary upon her death.* In my presence, Ms. Barrett gave specific instructions that she wanted her sister, Louise Cuddy and Louise Cuddy's two (2) daughters, Julia Maggio and Linda DiBennedetto, to be given those savings bonds in which they had a survivor's interest. The liquidation of the other savings bonds provided sufficient funds to address her income taxes related to the sale of the bonds and payment of the three years of long-term care, the disqualification period. Ms. Barrett had expressed this desire on more than one occasion, explaining that decision as a way to take care of those who had taken care of her. Once she had decided to give each sister a one-half interest in the Mary Rita Barrett Fellsway Trust, Ms. Barrett decided to liquidate all of her savings bonds.

. . . In connection with my representation of her, I prepared a General Durable Power of Attorney, a Health Care Proxy and The Mary Rita Barrett Fellsway Trust.  Mary Rita Barrett signed each document with full knowledge of both its contents and its legal consequences.  Even though she could no longer live independently, I am certain that Mary Rita Barrett understood clearly everything she intended to accomplish in creating her estate plan. . . .

. . .  I am also certain that the cashing in of Mary Rita Barrett's U.S. Savings Bonds was done at her express direction.

In developing this estate plan, Julia Maggio was given power of attorney almost as an alternate, because her own mother, Louise Cuddy, no longer drove an automobile.  As attorney-in-fact, she was able to drive her mother and herself on errands to carry out her aunt's wishes. Julia Maggio agreed to

take on these duties merely to assist her mother and her aunt.

(emphasis supplied).

### 3. Attorney Thomas J. Delaney

Attorney Delaney, who represented the Plaintiffs in the Essex Superior Court action, referenced "a volume of evidence that was presented at trial in the State Court Litigation that directly contradicts Attorney Ananian's memory" with reference to his attestation that Barrett "understood clearly everything she intended to accomplish in creating her estate plan." He noted that at trial in the state court there was evidence that Barrett had difficulty caring for herself before moving to the Life Care Center of Stoneham. He noted that she no longer used the telephone, could not use the stove safely, could not do her own laundry and had difficulties with hygiene and dressing. He noted that after moving to the Life Care Center she was diagnosed with Alzheimer's disease and had suffered a cerebral stroke. While at the Life Care Center she frequently was reported by staff to be "alert but confused."

Attorney Delaney also attested to an agreement pursuant to which Maggio would refrain from calling Attorney Ananian as a witness and the Plaintiffs would refrain from cross-examining Attorney Ananian about the notarization of Barrett's signature on the Durable Power of Attorney and other documents.

### C. The General Durable Power of Attorney

The General Durable Power of Attorney (the "power of attorney") was notarized by Attorney Ananian on February 23, 2004 as follows:

There personally appeared the above-named Mary R. Barrett, as Principal of the within General Durable Power of Attorney and acknowledged that she executed the same for the purposes therein contained, before me.

Maggio and Cuddy accepted their appointment as attorneys-in fact.

Pursuant to the power of attorney, Barrett granted Maggio and Cuddy "jointly and severally, full power to administer my personal and business affairs and to deal with all of my property, whether standing in my name alone or in my name with any other person or persons." Further, the power of attorney provided: "My attorneys-in-fact shall on my behalf have full power to exercise or perform any act, power, duty, right, or obligation whatsoever that I now have or may hereinafter acquire, relating to any person, matter, transaction, or property, real or personal, tangible or intangible, now owned or hereafter acquired by me, as I might or could do if personally present . . . ." Specifically, Barrett authorized her attorneys-in-fact to "sell and transfer stocks and bonds upon such terms and conditions as my said attorney deems advisable . . . ." In addition, Barrett granted her attorneys-in-fact the following power:

> To make gifts, grants, or other transfers (including the forgiveness of indebtedness and the completion of any charitable pledges I may have made) without consideration, either outright or in trust to such person(s) (including my attorney-in-fact hereunder) or organizations as my attorney-in-fact shall select, including, without limitation, the following actions: (a) transfer by gift in advancement of a bequest or devise to beneficiaries under my will or in the absence of a will to my spouse and descendants in whatever degree; (b) release of any life interest, or waiver, renunciation, disclaimer, or declination of any gift to me by will, deed, or trust (c) gifts of present interest from my property to my spouse, or to any one or more of my relatives, friends or next-of-kin . . . .

The power of attorney was not customized to Barrett's particular circumstances and has

many of the hallmarks of a generic legal form with its reference to "spouse and descendants"

where it is undisputed that Barrett was unmarried and had no children.

    D. <u>The Superior Court Action</u>

    The Court incorporates, in relevant part, the summary of the Superior Court

Litigation set forth in its Memorandum dated September 22, 2014.  In that decision, this

Court stated:

> On or around November 24, 2010, the Plaintiffs filed a Complaint against the
> Debtor in the Essex Superior Court.  In their Complaint, they alleged that
> Barrett executed a Durable Power of Attorney pursuant to which she
> appointed the Debtor as her attorney-in-fact.  They further alleged that at that
> time Barrett owned four bonds, each in the amount of $52,000.00.  The bonds
> were held jointly between Barrett and the Debtor, Barrett and Taajes, Barrett
> and Emery, and Barrett and Linda DiBenedetto ("DiBenedetto"), the Debtor's
> sister.  According to the Plaintiffs, the Debtor "owed a fiduciary duty to act
> fairly and in good faith;" was only authorized to act in the manner Barrett
> desired; and "breached her fiduciary duty by liquidating two of the four
> bonds and distributing the proceeds to herself and her sister . . . while
> liquidating the other two bonds and distributing the proceeds for the benefit
> of Mary Rita Barrett." According to the Plaintiffs, Barrett had expressed a
> desire to treat the Debtor, her sister and the Plaintiffs equally, yet the Debtor
> "for the sake of benefitting herself and her sister, handled the liquidation of
> the bonds disproportionally [sic]." The Plaintiffs added that the Debtor
> engaged in "prohibited self dealing," that she "exceeded her authority to act,"
> and that they suffered harm as a result.

> The Superior Court conducted a non-jury trial on March 20, 2013 and April 10,
> 2013 at which the Plaintiffs and the Debtor testified.  It issued the Superior
> Court Judgment, together with detailed findings of fact and rulings of law, on
> April 23, 2013.  The court initially focused on the physical and mental health
> of the parties' aunt, Barrett. . . .

> Barrett enjoyed a close relationship with her two sisters, Louise Cuddy, who
> had three children, including the Debtor and DiBenedetto; and Margaret
> McInnis, who had four children, including Taatjes and Emery.  Barrett
> routinely bought United States Savings Bonds.  The bonds bore her name as
> well as the names of one of her four nieces.  According to the Superior Court,

it was her "intention in purchasing all of the bonds  to eventually gift them, at some point after their maturity, to her four nieces in accordance with the listed alternative owner on each."  The court determined that while she bought more bonds for Louise Cuddy's children, it was her intention to treat the four nieces "roughly equally." She told Taatjes on three occasions that she wanted her nieces to receive their bonds upon her death.

Barrett entered the Life Care Center of Stoneham in Stoneham, Massachusetts in July of 2003 after suffering a stroke.  Prior to that time, her sister Louise was assisting her as she was experiencing signs of dementia.  Her sister Margaret previously had been diagnosed with Alzheimer's disease and was unable to contribute to her care.  Barrett died in 2007.  According to the Superior Court, before her placement at Life Care, Barrett was confused and forgetful; her condition steadily worsened and she was uncommunicative, although she enjoyed "the unwavering support of her family."

Sometime before February 23, 2004, the Debtor, her mother Louise, Attorney Ananian and another individual visited Barrett at the nursing home.  At that time, Barrett granted Louise and the Debtor powers of attorney.  She also agreed to the creation of a realty trust into which her Medford home would be transferred.  Barrett designated her sisters as the beneficiaries of the trust. According to the Superior Court, Barrett intended to divide her most significant asset equally between the families of her two sisters.  Attorney Ananian, who the Superior Court found was hired by the Debtor, drafted the documents.  Barrett executed a General Durable Power of Attorney on February 24, 2004, and a trust document establishing the Mary Rita Fellsway Trust on March 13, 2004.  The Debtor and her mother were named as trustees and 50% beneficiaries. On March 13, 2004, Barrett executed a quitclaim deed conveying her home to the trust for a consideration of $1.  Attorney Ananian notarized the deed.

According to the Superior Court, the Debtor testified that, at the nursing home, Barrett stated that she wanted the Debtor and DiBenedetto to keep the savings bonds bearing their names and that she wanted the Debtor to cash the other bonds bearing the Plaintiffs' names and use them to fund her nursing home expenses.  The Superior Court found that the Debtor's testimony was incredible for a number of reasons. Specifically, the court rejected the Debtor's testimony as contrary to the Plaintiffs' credible testimony and Barrett's medical records which established that Barrett's mental acuity was adversely affected by her stroke and dementia.  In view of the absence of a writing directing the disposition of the bonds in the manner asserted by the Debtor, and the likelihood that the Plaintiffs would conclude that the Debtor was

exerting undue influence over Barrett, the court stated:   "[t]he potential appearance of self-dealing was so obvious that it could not have escaped Maggio's comprehension, and she would have sought the protection of clear documentation that she was acting at Mary Rita's direction."   The court added:

> Not only did Maggio not seek to memorialize in some fashion Mary Rita['s] supposed decision about the bonds, but *she affirmatively sought to keep it from her McInnis cousins, and, when confronted about it, she lied.*   After Taatjes learned from Louise that Maggio and DiBenedetto had taken their bonds and that she and Emery were supposed to receive theirs, Taatjes called Maggio and inquired. Maggio replied, "I don't know anything about bond money.  I didn't get any bond money."  *The false denial reflects consciousness of guilt on her part that is inconsistent with having merely followed the expressed wishes of Mary Rita.*  So too does her subsequent statement to Taatjes in the same phone conversation, "Patty, I can't believe I have gotten myself into this mess."

(emphasis supplied).  The court, while noting that Barrett might have elected to treat the Debtor differently than her other nieces, determined that  it made no sense and "smack[ed] of a decision made by her sister, Maggio" for Barrett to favor DiBenedetto who had moved to New York and rarely saw her aunt. Thus, the court reiterated its conclusion that Barrett "did not tell Maggio that she and DiBenedetto should keep the bonds bearing their names and that the the McInnis bonds should be cashed to pay for her care."

The court also found that Maggio was involved in marketing and selling Barrett's home in July of 2004 for which the real estate trust in which it was held received $471,310.90.  The Debtor received $30,000 for her role in the sale. In March of 2005, about a year after becoming attorneys-in-fact, the Debtor and her mother removed bonds from Barrett's safety deposit box and began cashing them.  On March 28, 2005, they cashed all the bonds bearing the names of Emery and Taatjes, receiving a total of $84,924.64 (approximately $42,000 each).  The bonds with the Debtor's name and that of her sister totaled approximately $108,000. The Debtor converted her bonds to H series bonds and gave DiBenedetto the proceeds of her bonds.

According to the Superior Court, the Debtor and her mother opened a checking account in Barrett's name with access limited to them.  The stated purpose of the account was to pay Barrett's bills.  At the time of her death,

there was in excess of $100,000 in the account which was distributed to Barrett's sister and the Debtor's mother, Louise.

Barrett's nursing home care was costly.  For her nearly four-year stay, her expenses totaled approximately $365,000.  Although the Debtor testified that the proceeds of the Plaintiffs' bonds was needed for Barrett's care, "they were neither needed nor used for that purpose, but instead were appropriated by Maggio and/or Louise."  The court reasoned  that Barrett had substantial savings and certificates of deposit at the time she entered Life Care and that the Debtor's testimony that she cashed bonds in Barrett's name and the names of other relatives in addition to the Plaintiffs  and deposited the proceeds in the joint checking account, was not credible, particularly in the absence of any documentation as to the existence of such bonds and evidence that Barrett's assets were exhausted, particularly where there was a $100,000 surplus in Barrett's estate that went to the Debtor's mother upon Barrett's death.  Thus, the court concluded that the proceeds from the Plaintiffs' bonds were not used to pay Barrett's bills but went to the Cuddy family "either via the passing of the joint checking account proceeds to Louise at the time of Mary Rita's death, or otherwise."

Based upon its findings, the Superior Court determined that the Debtor breached her fiduciary duty to Barrett.  It set forth the applicable law as follows:  "A claim of breach of fiduciary duty involves three elements:  the existence of a fiduciary relationship, a breach of the resulting fiduciary duty, and resulting harm."  It added that only the second element was at issue. Citing Mass. Gen. Laws ch. 201B, § 1(a), and Gagnon v. Coombs, 39 Mass. App. Ct. 144, 154 (1995), it determined that the power of attorney "'created . . . a traditional principal-agent relationship.  That relationship has one supreme characteristic: as [Mary Rita's agent, [the defendant] stood in a fiduciary relationship to [Mary Rita] with respect to all matters within the scope of the agency." The court concluded Barrett breached her fiduciary duty and entered judgment in favor of the Plaintiffs in the sum of $84,924.64, plus interests and costs.  Maggio appealed.  She has not prosecuted the appeal, however, and the Plaintiffs did not seek relief from the automatic stay to pursue the appellate proceeding.

In re Maggio, 518 B.R. at 181-84 (footnotes omitted).[2]

---

[2] Mass. Gen. Laws Gen. Laws ch. 201B, §§ 1-7, the Uniform Durable Power of Attorney Act, was repealed effective January 15, 2009. According to the court in Guardianship of Smith:

## IV. DISCUSSION

    A. <u>Section 523(a)(4)</u>

This Court in its Memorandum dated September 22, 2014 set forth the law applicable

to section 523(a)(4) of the Bankruptcy Code, stating, in pertinent part, the following:

> Section 523(a)(4), excepts from discharge any debt "for fraud or defalcation
> while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. §
> 523(a)(4). "To except a debt from discharge under § 523(a)(4) for defalcation
> while acting in a fiduciary capacity, a creditor must show by a preponderance
> of the evidence that: (1) the debt results from a fiduciary's fraud or defalcation
> under an "express" or "technical trust"; (2) the debtor acted in a fiduciary
> capacity with respect to that trust; and (3) the debt was caused by a fraud or
> defalcation within the meaning of bankruptcy law." <u>Stallworth v. McBride (In
> re McBride)</u>, 512 B.R. 103, 113 (Bankr. D. Mass. 2014) (citing <u>Raso v. Fahey (In
> re Fahey)</u>, 482 B.R. 678, 687 (B.A.P. 1st Cir. 2012)). Federal law determines
> whether a fiduciary relationship exists under § 523(a)(4). <u>Id.</u> (citing <u>In re
> Fahey</u>, 482 B.R. at 687; and <u>Blyler v. Hemmeter (In re Hemmeter)</u>, 242 F.3d
> 1186, 1189 (9th Cir. 2001)). *See also* <u>Breed's Hill Ins. Agency, Inc. v. Fravel ( In
> re Fravel)</u>, 485 B.R. 1, 14 (Bankr. D. Mass. 2013). In <u>Fravel</u>, this Court, citing,
> *inter alia,* <u>In re Fahey</u>, observed:
>
> > The requirement of an express trust requires "an explicit
> > declaration of trust, a clearly defined trust res, and an intent to

---

General Laws c. 201B, § 1( a ), as inserted by St.1981, c. 276, § 2, provides:
"A durable power of attorney is a power of attorney by which a principal,
in writing, designates another as his attorney in fact and the writing
contains the words, 'This power of attorney shall not be affected by
subsequent disability or incapacity of the principal,' or 'This power of
attorney shall become effective upon the disability or incapacity of the
principal,' or similar words showing the intent of the principal that the
authority conferred shall continue notwithstanding the subsequent
disability or incapacity of the principal."

43 Mass. App. Ct.493, 684 N.E.2d 613, 614 n.1 (1997).  The statutory provisions defining
and authorizing a durable power of attorney are now contained in Mass. Gen. Laws ch..
190B, §§ 5-501 to 5-507.

create a trust relationship." Id. (citing Gehlhausen v. Olinger (In re Olinger), 160 B.R. 1004, 1014 (Bankr. S.D. Ind. 1993) (internal quotations and citations omitted); LaPointe v. Brown (In re Brown), 131 B.R. 900, 905 (Bankr. D. Me. 1991)). In contrast, a technical trust "'arises under statute or common law.'" Fahey, 482 B.R. at 688 (quoting In re D'Abrosca, 2011 WL 4592338, at *5; Farley v. Romano (In re Romano), 353 B.R. 738 (Bankr. D. Mass. 2006); M–R Sullivan Mfg. Co. v. Sullivan (In re Sullivan), 217 B.R. 670, 674 (Bankr. D. Mass. 1998); Collenge v. Runge (In re Runge), 226 B.R. 298, 305 (Bankr. D. N.H. 1998)). Additionally, according to the Bankruptcy Appellate Panel in Fahey, "[w]here the basis for the existence of a technical trust is statutory, the statute must '(1) define[ ] the trust res, (2) spell [ ] out the trustee's fiduciary duties, and (3) impose[ ] a trust prior to and without reference to the wrong that created the debt.' " 482 B.R. at 488 (citing Stowe v. Bologna (In re Bologna), 206 B.R. 628, 632 (Bankr. D. Mass. 1997)).

In re Fravel, 485 B.R. at 14.

In re Maggio, 518 B.R. at 186-87.  As noted by the court in D'Angelo v. McKean (In McKean), No. 11-23743, Adv. P. No. 12-6018, 2014 WL 184983 (Bankr. D. Kan. Jan. 15, 2014), "[f]or purposes of section 523(a)(4), the definition of 'fiduciary' is narrowly construed, meaning that the applicable nonbankruptcy law that creates a fiduciary relationship must clearly outline the fiduciary duties and identify the trust property." Id. at *4 (footnote omitted). Noting the need for an express or technical trust for a fiduciary relationship to exist under section 523(a)(4), the court stated:  "not all fiduciary relationships which exist under common law or state law rise to the level actionable under § 523(a)(4)." Id.

The Court in Maggio, also discussed Bullock v. BankChampaign, N.A., __ U.S. __, 133 S.Ct. 1754 (2013), in which the United States Supreme Court resolved a split among the circuits as to the requisite mental state for finding a defalcation.  The Court observed that the

petitioner was, in effect, asking it "to decide whether the bankruptcy term "defalcation"

applies "'in the absence of any specific finding of ill intent or evidence of an ultimate loss of

trust principal.'"  133 U.S. at 1758.  The Court stated:

> The lower courts have long disagreed about whether "defalcation" includes
> a scienter requirement and, if so, what kind of scienter it requires. *Compare* <u>In
> re Sherman</u>, 658 F.3d 1009, 1017 (9th Cir. 2011) ("defalcation" includes "even
> innocent acts of failure to fully account for money received in trust" (internal
> quotation marks and brackets omitted)), *with* <u>In re Uwimana</u>, 274 F.3d 806, 811
> (4th Cir. 2001) (defalcation occurs when "negligence or even an innocent
> mistake . . . results in misappropriation"), *with* 670 F.3d, at 1166 ("defalcation
> requires . . .  conduct [that] can be characterized as objectively reckless"), and
> *with* <u>In re Baylis</u>, 313 F.3d 9, 20 (1st Cir. 2002) ("defalcation requires something
> close to a showing of extreme recklessness"). In light of that disagreement, we
> granted the petition.

<u>Bullock</u>, 133 S.Ct. at 1758.

Thus, in <u>Bullock</u>, the Supreme Court established the requisite mental culpability for

defalcation under § 523(a)(4), stating: "In resolving these differences, we note that this

longstanding disagreement concerns state of mind, not whether "defalcation" can cover a

trustee's failure (as here) to make a trust more than whole. We consequently shall assume

without deciding that the statutory term is broad enough to cover the latter type of conduct

and answer only the "state of mind" question.  <u>Id.</u> at 1759.  Relying upon <u>Neal v. Clark</u>, 95

U.S. 704, 709 (1978), it held that the term "defalcation" "must include "a culpable state of

mind requirement akin to that which accompanies application of the other terms in the same

statutory phrase," adding "[w]e describe that state of mind as one involving knowledge of,

or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."

16

Id. at 1757.[3]

In this case, although the Superior Court determined that Maggio owed Barrett a fiduciary duty, it did not determine that Maggio owed the Plaintiffs a fiduciary duty or that an express or technical trust existed between Maggio and the Plaintiffs. In Charles Cnty. Nursing and Rehab. Ctr. v. Marbury (In re Marbury), No. 09-13017PM, Adv. P. No. 09-0214, 2009 WL 4639599 (Bankr. D. Md. Dec. 2, 2009), the court observed that the plaintiff's complaint failed to state a claim under section 523(a)(4), stating:

> . . . "[F]or the debt to be nondischargeable under section 523(a)(4), it must be directly related to the fiduciary relationship between the debtor and the creditor." *Collier on Bankruptcy* ¶ 523.10[1][d] at 523–74 (15th ed. rev.2009) ...

---

[3] The Supreme Court elaborated:

[W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985). *See* id., § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include "'wilful blindness'"). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." Id., § 2.02(2)(c), at 226 (emphasis added). *Cf*. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (defining scienter for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").

Bullock, 133 S.Ct. at 1759-60.

"A threshold inquiry is whether a fiduciary obligation runs from the debtor to the creditor." In re House, 2007 WL 2126260 *3 (BC N.D. Ill.)[, aff'd, 2007 WL 2908815 (N.D. Ill. Oct. 4, 2007)]. Put another way, a plaintiff must prove two elements: a fiduciary relationship between it and the debtor and fraud or defalcation committed by the debtor in the course of that fiduciary relationship. Young v. Fowler Bros., 91 F.3d 1367, 1371 (CA1 0 1996); Lexington Health Care Ctr. of Elmhurst, Inc., v. McDade, 282 B.R. 650, 658–659 (B.C. N.D. Ill. 2002); In re Hogue, 221 B.R. 786, 793 (B.C.N.D. Okla. 1998).

In re Marbury, 2009 WL 4639599 at *2. See also Altercare of Navarre Ctr. for Rehab. & Nursing Care, Inc. v. Donley (In re Donley), No. 13-60758, Adv. P. No. 13-6085, 2014 WL 1577236 at *11 (Bankr. N.D. Ohio April 17, 2014);[4] Silver Care Ctr. v. Parks (In re Parks), No. 05-371544, Adv. P. No. 05-2774, 2007 WL 2033380 at *15 (Bankr. D. N.J. July 102, 2007);[5] Lexington Health Care Ctr. of Elmhurst v. McDade (In re McDade), 282 B.R. 650, 660 (Bankr. N.D. Ill. 2002).[6]

---

[4] In In re Donley, the court held that "a direct fiduciary link between the debtor and creditor is required to bring a claim of defalcation in a fiduciary capacity." 2014 WL 1577236 at * 11.

[5] In In re Parks, the court determined: "Here, the fiduciary duty owed by the debtor to her mother during the year preceding her death was not owed to Silver Care, and did not constitute an express trust under section 523(a)(4). The plaintiff's quest for relief in this regard must fail." 2007 WL 2033380 at *15.

[6] In In re McDade, the court stated:

First, the Creditor must establish, by a preponderance of the evidence, the existence of an express trust or fiduciary relationship between it and the Debtor. The Creditor does not allege that an express trust existed between it and the Debtor. Rather, the Creditor contends that the Admission Agreement, which was signed by the Debtor as the responsible party, coupled with the Power of Attorney, gave rise to an implied or constructive fiduciary relationship between the Debtor and the Creditor. As one leading authority notes, "for the debt to be nondischargeable under section 523(a)(4), it must be directly related to the fiduciary relationship between the debtor and the creditor." 4 L. King, Collier on Bankruptcy ¶ 523.10[1][c]

18

B. <u>Summary Judgment Standard</u>

In <u>Weiss v. Wells Fargo Bank, N.A. (In re Kelley)</u>, 498 B.R. 392 (B.A.P. 1st Cir. 2013),

the United States Bankruptcy Appellate Panel of the First Circuit stated:

> "In bankruptcy, summary judgment is governed in the first instance by
> Bankruptcy Rule 7056." <u>Desmond v. Varrasso (In re Varrasso)</u>, 37 F.3d 760, 762
> (1st Cir.1994). "By its express terms, the rule incorporates into bankruptcy
> practice the standards of Rule 56 of the Federal Rules of Civil Procedure." <u>Id.</u>;
> *see also* Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56. "It is apodictic that summary
> judgment should be bestowed only when no genuine issue of material fact
> exists and the movant has successfully demonstrated an entitlement to
> judgment as a matter of law." <u>In re Varrasso</u>, 37 F.3d at 763 (citing Fed. R. Civ.
> P. 56(c)). The "mere existence of some alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no genuine issue of material fact."
> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91
> L.Ed.2d 202 (1986).

<u>In re Kelley</u>, 498 B.R. at 397 (footnote omitted). *See also* <u>Lowell Dev. and Fin. Corp. v. Winter</u>

<u>Hill Bank, FSB (In re Natale)</u>, 508 B.R. 790, 799–800 (Bankr. D. Mass. 2014).

When determining a motion for summary judgment, the court must view all facts and

reasonable inferences in the light most favorable to the non-moving party.   <u>Altercare of</u>

---

at 523–75 (rev. 15th ed.2002). Thus, it is insufficient for purposes of the
Creditor's claim against the Debtor to merely establish that the Debtor was
a fiduciary to Norman Clarke [McDade] under the Power of Attorney. The
Creditor must also establish that the Debtor was in a fiduciary relation
owing it such a level of duties, and not strictly in a debtor-creditor
relationship. Under the facts of the matter at bar, this could only occur if
the Admission Agreement created a contractual fiduciary relation between
the Debtor and the Creditor. *See* generally 3 W. Norton, Jr., Norton on
Bankruptcy Law and Practice 2d § 47.22 at 47.61 (1997).

282 B.R. at 658-59.

Navarre Center for Rehab. & Nursing Care, Inc. v. Donley (In re Donley), 2014 WL 1577236, at *4 (Bankr. N.D. Ohio April 17, 2014) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "The moving party has the burden to show that no genuine issue of material fact exists." S. Rehab. Grp., P.L.L.C. v. Sec'y of Health & Human Servs., 732 F.3d 670, 676 (6th Cir.2013). If the moving party meets its burden, however, the burden shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." In re Donley, 2014 WL 1577236, at *4 (citing Matsushita, 475 U.S. at 586).

    C. Positions of the Parties

       1. The Debtor

The Debtor relies upon In re Marbury, 2009 WL 4639599 at *2, In re Donley, 2014 WL 1577236, at *11 and In re Parks, 2007 WL 2033380 at * 15, arguing as follows:

> [T]he plaintiffs fail to meet the first element – specifically, the threshold requirement of establishing that there was fiduciary relationship between them and the Debtor. To explain, by virtue of the Durable Power of Attorney (Exhibit A), an agency relationship was created between Debtor and Bennett [sic], with Bennett [sic] being the principal and the Debtor as agent. There was no power of attorney between the Debtor and the plaintiff [sic], and therefore, no agency between them. The Durable Power of Attorney only created a fiduciary relationship between Barrett and the Debtor, and the fact that the Debtor had a fiduciary duty to Barrett, does not bootstrap that duty to third-party creditors of the person owed the duty or the Debtor.

       2. The Plaintiffs

The Plaintiffs observe that the Debtor properly recognizes that the issue under consideration is not whether a fiduciary relationship existed between the Debtor and Barrett, but rather whether a fiduciary relationship existed between the Debtor and the

20

Plaintiffs.  They state that "the Debtor has not offered any material evidence. The Debtor does state that the Power of Attorney entered into by and between the Debtor does not impose a direct fiduciary relationship between the Debtor and the Creditors.  The Creditors do not dispute this assertion."  They also recognize that it is incumbent upon them to produce evidence that would allow a trier of fact to conclude that a direct fiduciary relationship existed between the Creditors [the Plaintiffs] and the Debtor.

Citing, *inter alia*, <u>Univ. Restoration Servs., Inc. v. Hartung (In re Hartung)</u> 511 B.R. 538, 545 (E.D. Wis. 2014), and <u>Gidelski v. Anton (In re Anton)</u>, No. 08-64144, Adv. P. No. 09-04344, 2013 WL 1747907 (Bankr. E.D. Mich. April 12, 2013), the Plaintiffs contend that they can satisfy their burden by pointing to the existence of a technical trust "based upon the mere nature of the relationship between the Creditor [sic] and Debtor where the common law imposes a fiduciary obligation upon the Debtor based upon that relationship."  The Plaintiffs further contend that an implied fiduciary relationship can be found where the Debtor held their funds, segregated their funds from their control, and there was a disparity in bargaining power.  They state:

> In the case at bar, it is well established that the Debtor controlled the Creditors' funds as the Debtor held bonds bearing the Creditors' names which bonds were intended to benefit the Creditors. As well, it has been established that the Debtor segregated the funds from the Creditors. Moreover, the Debtor secreted her control over the Creditors' funds from the Creditors and when asked about the status of the funds lied to the Creditors about the funds. Finally, the Debtor's bargaining power as to the use and control of the Creditors' funds was quite disparate from the Creditor [sic]. The Debtor had all of the power with regard to the bonds and the Creditors had no power whatsoever.

D. <u>Analysis</u>

Although a power of attorney generally creates a traditional principal-agent relationship, that relationship has "one supreme characteristic," namely that the agent stands in a fiduciary relation to the principal with respect to all matters within the scope of the agency. Gagnon v. Coombs, 39 Mass. App. Ct. 144, 153, 654 N.E.2d 54, 60 (1995), *review denied*, 421 Mass. 1106 (1995)(citing Restatement (Second) of Agency §§ 1, 13, 375). *See also* Perez v. First Option Mortg. Corp. (In re Perez), No. 08-40693-JBR, Adv. P. No. 08-4081, 2008 WL 4164372 (Bankr. D. Mass. Sept. 3, 2008). As noted in In re Maggio, this Court, as a threshold matter, must determine whether an express or technical trust exists. Second, the Court must determine whether the Debtor acted in a fiduciary capacity with respect to the trust. Finally, the Court must determine that the debt arose from fraud or defalcation while acting in a fiduciary capacity, which requires proof that the Debtor had "knowledge of, or [acted with] gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." 518 B.R. at 189 (citing Bullock, 133 S.Ct. at 1757). In Maggio, this Court noted that, as between the parties, "[t]hese issues do not coincide with the issues addressed in the state court action, namely 1) the existence of a fiduciary relationship; 2) a breach of the resulting fiduciary duty, and 3) resulting harm. Id.

The Court concludes, as did the Superior Court, that the power of attorney in favor of the Debtor and her mother created a fiduciary relationship between the Debtor and Barrett under state law. The existence of that fiduciary duty is compelled because Barrett, who the Plaintiffs contend was suffering from the effect of a stroke and dementia at the time she executed the document, ceded control of all her affairs, including her financial affairs to

22

Maggio and Cuddy.  Pursuant to the power of attorney, Barrett empowered the Debtor and her mother to exercise complete control over her personal and financial affairs.  That control extended to disposition of the savings bonds, which Attorney Ananian stated contained Barrett's name and "named another relative as beneficiary upon her death."  Nevertheless, the General Durable Power of Attorney did not create an express or technical trust that required Maggio to act in a fiduciary capacity toward the Plaintiffs.  In other words, the power of attorney did not impose fiduciary obligations running from the Debtor to the Plaintiffs.

Although Attorney Ananian generally described the savings bonds as naming Maggio and her cousins as beneficiaries of the bonds purchased by Barrett in his Affidavit and Justice Lang indicated that the bonds were held by Barrett and her nieces (the Plaintiffs, Maggio, and DiBenedetto) as alternative owners, this  Court lacks specific evidence as to precisely how the savings bonds were held as no copies of the bonds were attached to the affidavits of the Debtor, Attorney Ananian or Attorney Delaney.  The court in Flowers v. U.S., 75 Fed.Cl. 615 (2007), *aff'd*, 321 F.App'x 928 (Fed. Cir. 2008), observed:

> Generally, savings bonds are "not transferable and are payable only to the owners named on the bonds." 31 C.F.R. § 353.15. Further, "registration is conclusive of ownership." Id. § 353.5(a). A savings bond may "be registered in the names of individuals" and "payable on death to another." Id. § 353.7(a)(3). This type of savings bond is considered to be registered in "beneficiary form." Id. § 353.7(a) (providing that a savings bond may be registered either in single ownership form, coownership form, or beneficiary form). Pursuant to the regulations, when payment is made during the lifetime of the owner of a "beneficiary bond," "the beneficiary will cease to have any interest in the bond." Id. § 353.38.

Flowers, 75 Fed.Cl. at 629.  *See also* U.S. v. Chandler, 410 U.S. 257, 260-61 (the decedent ...

23

chose not to have the bonds in question reissued in the names of her granddaughters, as she might have done pursuant to the applicable regulations. Instead, she merely delivered the bonds to the granddaughters with donative intent. Our issue is whether that delivery, accompanied by that donative intent, was sufficient to remove the bonds from the decedent's gross estate. We conclude that it was not."). *See generally* Laurence M. Jones, *United States Savings Bonds, Series, E, F, and G,* Md. L. Rev. 265, 276 (1950)( noting that "[E]ither co-owner may secure payment of a bond upon his separate request without securing the assent of the other, and such payment completely terminates the interest of the co-owner in the bond.").

In view of these principles and the ability of both Maggio and Cuddy to liquidate the bonds, the Court concludes that if Barrett had obtained the bonds in her own name, merely intending to deliver them to the beneficiaries after maturity, Maggio and Cuddy could liquidate them under the power of attorney without violating any fiduciary duty to the Plaintiffs. If the bonds were co-owned, then Maggio conceivably converted the Plaintiffs' interests in the bonds. The Plaintiffs, however, did not assert a claim for an exception to discharge for willful and malicious injury arising from conversion of the bonds under 11 U.S.C. § 523(a)(6) and the time to do so has expired. *See* Fed. R. Bankr. P. 4007(c). In either circumstance, Maggio, as Barrett's attorney-in- fact under the power of attorney, could and did sell the bonds, thereby divesting the Plaintiffs of any interests in the savings bonds standing in their names and Barrett's name.

Because the Plaintiffs failed to point to any evidence in the record that would

24

establish that "a fiduciary obligation [ran] from the debtor to the creditor," In re Marbury, 2009 WL 4639599 at *2, this Court finds that there are no genuine issues of material fact and the Debtor is entitled to summary judgment as a matter of law.  The Superior Court did not find the existence of an express or technical trust that imposed fiduciary duties on Maggio to act in a fiduciary capacity with respect to the bonds standing in the names of Barrett and the Plaintiffs.  Moreover, Attorney Delaney did not state or imply that such a trust existed and merely suggested that Barrett lacked the capacity to execute the power of attorney and other documents in 2004 in view of her dementia.   Accordingly, even if this Court were to assume that the power of attorney was procured as a result of the undue influence of Maggio and Cuddy, and thus is void or voidable under state law because of Barrett's lack of capacity, the Plaintiffs failed to submit evidence of an express or technical trust imposing fiduciary duties on Maggio in favor of the Plaintiffs.  The power of attorney did not create such a fiduciary relationship between the Plaintiffs and Maggio and the savings bonds themselves did not impose such a relationship.

In sum, while the power of attorney executed by Barrett may have established a fiduciary relationship between the Debtor and Barrett, it did not establish a fiduciary duty between the Debtor and the Plaintiffs with respect to the bonds standing in the joint names of Barrett and Emery, and Barrett and Taatjes for purposes of section 523(a)(4).  There was no express trust created that imposed fiduciary duties on Maggio to act for the benefit of her cousins, the Plaintiffs.  In addition, there was no technical trust created.  "A technical trust is one that is imposed by either statutory or common law." See Moore v. Murphy (In re

Murphy), 297 B.R. 332, 348 (Bankr. D. Mass. 2003).  The Superior Court made no findings of

a trust agreement pertinent to the savings bonds, and the Plaintiffs did not point to evidence

that would enable a finding of a technical trust that preceded the Debtor's liquidation of the

bonds.  Although the Debtor had a fiduciary duty to Barrett, the Plaintiffs failed to rebut the

evidence submitted by the Debtor that no express or technical trust existed between the

parties by pointing to competent evidence in the record that would, at the least, create a

genuine issue of material fact.

## V. CONCLUSION

Upon consideration of the foregoing, the Court shall enter an order granting the

Debtor's Motion for Summary Judgment.

By the Court,

Dated:  July 27, 2015                                    Joan N. Feeney
                                                        United States Bankruptcy Judge

26